2010 Ark. App. 561

**Mark F. DUNCAN, Appellant**

v.

**Cheryl Anne DUNCAN, Appellee.**

**No. CA 10–13.**

Court of Appeals of Arkansas.

Sept. 1, 2010.

---

Terry J. Lynn, Heber Springs, AR, for appellant.

Richard H. Mays, Ginger L. Harper, May & White, PLLC, Heber Springs, AR, for appellee.

JOHN B. ROBBINS, Judge.

This appeal involves the division of the husband's pension account following a divorce where the value of the account had declined between the time of the divorce and the distribution of the funds. The Cleburne County Circuit Court interpreted the parties' settlement agreement as providing appellee Cheryl Duncan with a fixed sum from the account and ordered appellant Mark Duncan to pay appellee approximately $116,000 representing the difference between her share of the balance as of the date the parties executed their property settlement agreement and the amount she had already received. Appellant con-

tends that the circuit court erred in so ruling and advances several arguments for reversal. We reverse and remand.

In 2006, appellee filed suit for divorce after sixteen years of marriage. After negotiations, the parties entered into a property-settlement agreement dated May 30, 2007. The agreement addressed the parties' retirement and investment accounts, including appellant's pension plan. In relevant part, it provides as follows:

13. **Other Accounts.** Each party shall receive one-half (½) of all vested retirement, profit sharing, 401K, stock, or other accounts in their joint or individual names accumulated during the marriage based upon the balances as of the date of execution of this Agreement. Each party shall receive as his or her separate property an amount equal to the balance of each account, if any, at the time of the marriage.

[Appellant] is currently vested in a tax qualified retirement or profit sharing account through his employer, which account is with State Farm Insurance Company and is being managed by . . . a local agent. From the balance of this account as of the date of execution of this Agreement shall be deducted the balance of [appellant's] tax qualified retirement or profit sharing account as of the date of the marriage of the parties (the "premarital amount"), which amount shall be [appellant's] sole and separate property, with the remaining balance being divided equally between the parties, with [appellee's] portion being rolled over into a individual retirement account or other I.R.S. qualified account of [appellee's] choice, any taxes or penalties arising from such transaction being the responsibility of [appellee].

Likewise, the State Farm Account in the name of [appellee] shall be divided in the same manner, giving her credit for the balance as of the date of the marriage (the "premarital amount") and the balance, if any, being rolled over into a individual retirement account or other I.R.S. qualified account of [appellant's] choice, any taxes or penalties arising from such transaction being the responsibility of [appellant].

If necessary, a Qualified Domestic Relations Order within the meaning of Section 206(d) of the Employee Retirement Income Security Act of 1974 and Section 414(p) of the Internal Revenue Code of 1954, both as amended by the Retirement Equity Act of 1984 shall be entered and both parties agree to cooperate and provide any necessary information to carry out the division of these accounts.

The divorce decree was entered on June 15, 2007. It approved the property settlement agreement and incorporated it by reference without merging the agreement into the decree.

The court subsequently entered a Qualified Domestic Relations Order (QDRO) on August 23, 2007, which, in pertinent part, provided as follows:

6. This Order, in accordance with the Property Settlement Agreement between the parties, hereby assigns to Alternate Payee [appellee] 38.551% of the account balance as of May 30, 2007, which represents fifty percent (50%) of the Participant's [appellant's] account balance on that date after deducting the premarital account balance.

. . . .

11. Upon the division of the Participant's account as provided for herein, the Alternate Payee shall have no further right, title or interest in and to the Participant's account, or any increase in the value thereof, and the same shall constitute the sole and separate proper-

ty of the Participant. Similarly, upon such division, the Participant shall no longer have any interest in that portion of the account as is hereby assigned to the Alternate Payee, and such assigned portion of the account, including any increase in the value thereof, shall constitute the sole and separate property of the Alternate Payee. In the event the Plan overpays benefits to either the Participant or the Alternate Payee, the Participant or the Alternate Payee, as the case may be, shall repay such excess payment to the Plan, and the Plan shall be entitled to recovery of such overpayment.

On October 9, 2008, appellee instituted the present case and filed a Petition for Citation for Contempt and for Judgment, later amended,[1] asserting, *inter alia,* that appellant had failed and refused to sign the documents necessary to transfer her interest in his retirement plan to a separate account she controlled.[2] Appellee averred that she was owed the value of her share of the plan as of May 30, 2007. On February 13, 2009, the amount of $203,161 was transferred to appellee's separate IRA account.

After a hearing, the circuit court issued a letter opinion on August 31, 2009. The court found that the terms of the parties' property-settlement agreement were unambiguous. The circuit court also ruled that the intent of the parties was that appellee was to receive one-half of the value of appellant's share in the plan, less the premarital amount, fixed as of May 30, 2007; and that the value of her share on that date was $319,097.81. The court granted judgment in favor of appellee against appellant for the difference in the amount of $115,936.81. The court found that appellee disputed that her share was correctly valued at $319,097.81 and, therefore, refused to accept a distribution of that amount in April 2008. The court held that, although this did not result in appellee waiving her share of appellant's account, it did preclude her from receiving interest on her share or her attorney's fees. The court entered its written judgment on October 1, 2009. On October 13, 2009, appellant filed his notice of appeal.[3]

1. The amended petition also sought judgment against appellant in the amount of $3,000 for expenses incurred on behalf of the parties' minor children for which appellant was to reimburse appellee. Appellee also alleged that there had been a material change in circumstances and that appellant's child-support obligation should be increased. The circuit court denied these requests and appellee did not file a cross-appeal as to these issues.

2. An earlier contempt petition did not involve the division of the accounts at issue in this appeal. The parties agreed to the entry of an agreed order on February 25, 2008, that set off approximately $48,000 appellant owed appellee for obligations under the divorce decree from the amount he was to receive from the division of appellee's State Farm account. After the set-off, appellee owed appellant approximately $23,000, which appellee testified that she paid.

3. Appellant timely filed a motion for reconsideration on October 8, 2009. Under Ark. R.App. P.—Civil 4(b)(1), the circuit court had thirty days after that date to decide the motion and enter that decision of record. This thirty-day time period expired on Monday, November 9, 2009. The court entered its order deciding the motion beyond this deadline on November 30, 2009. Therefore, the order is void because the court lost jurisdiction to act on the motion after the expiration of thirty days. Because the motion for a new trial was deemed denied by the court's inaction, the rulings in the original judgment entered on October 1, 2009, stand without alteration. *Slaton v. Slaton,* 330 Ark. 287, 956 S.W.2d 150 (1997) (holding that late entry of new trial order was void for lack of jurisdiction).

We review the circuit court's findings of fact in equity cases de novo and affirm them unless they are clearly erroneous. *Stehle v. Zimmerebner*, 375 Ark. 446, 291 S.W.3d 573 (2009). A finding is clearly erroneous when the reviewing court, based on the entire evidence, is left with the definite and firm conviction that a mistake has been made. *Id.* Questions relating to the construction, operation, and effect of settlement agreements are governed, in general, by the rules and provisions applicable in the case of other contracts generally. *Surratt v. Surratt*, 85 Ark. App. 267, 148 S.W.3d 761 (2004). The circuit court has the power to construe, clarify, and enforce the parties' settlement agreement. *Id.*

A "qualified domestic relations order" is a domestic relations order which creates or recognizes the existence of an alternate payee's right to receive all or a portion of the benefits payable to a participant in a pension plan. *Mitchell v. Mitchell*, 40 Ark. App. 81, 842 S.W.2d 66 (1992). It is the mechanism by which a divorce decree awarding retirement benefits to a spouse is enforced and collected with regard to the particular retirement program covered by the decree. *Blaine v. Blaine*, 275 Neb. 87, 744 N.W.2d 444 (2008); *Elliott v. Elliott*, 217 P.3d 147 (Okla.Civ.App. 2008). A QDRO must conform to the terms of the underlying decree. *Elliott, supra.*

Appellant argues that the circuit court erred in finding that appellee was entitled to one-half of the fixed dollar amount of appellant's account as of May 30, 2007. We agree. As noted earlier in this opinion, the value of appellant's pension plan had declined from the May 30, 2007 execution of the settlement agreement until appellee received approximately $203,000 in February 2009. Neither the parties' briefs nor our own research have disclosed an Arkansas case that addresses the specific issue in this case.

Courts in a number of jurisdictions have held that, absent express language to the contrary, the party receiving the plan distribution shares in any interim increase or decrease in the value of the account. *See Buchanan v. Buchanan*, 936 So.2d 1084, 1088–89 (Ala.Civ.App.2005) (awarding wife half of the shares comprising her husband's retirement account, pursuant to an agreement, despite their decrease in value between the time of judgment and the time of distribution because she was equally responsible for the delay in their distribution); *Shorter v. Shorter*, 851 N.E.2d 378, 385–86 (Ind.App.2006) (finding even though the divorce decree referred to a specific valuation date for the pension plan, in the absence of express language otherwise, the decree implicitly contemplated that both parties would share equally in gains or losses occurring after the valuation date and before division was accomplished); *Beike v. Beike*, 805 N.E.2d 1265, 1268–69 (Ind.App.2004) (holding "absent express language to the contrary, the risks and losses associated with the pension plan should be borne by both parties as their respective interests were allocated by the trial court"); *Austin v. Austin*, 748 A.2d 996, 999 (Me.2000) (establishing the valuation date of the 401(k) as of the date of distribution rather than the date of the decree to award gains and losses in proportion to the parties' share in the fund); *Rivera v. Zysk*, 136 Md.App. 607, 766 A.2d 1049, 1056 (Md.Spec.App.2001) (holding that trial court's decision awarding the wife half of the gains in the husband's 401(k) plan from the date of the divorce until the date of distribution approximately one year later was "eminently fair"); *Taylor v. Taylor*, 258 Wis.2d 290, 653 N.W.2d 524, 527–28 (2002) (holding that the wife's thirty-five percent share of the husband's 401(k) plan as of the date of the divorce

was subject to market gains and losses from that date until the wife received her share). *But see Baker v. Baker*, 38 Va. App. 384, 564 S.E.2d 164, 166 (2002) (reversing entry of a QDRO that awarded gains and losses when the dissolution decree provided the wife one-half of the husband's profit sharing valued as of the date of the agreement but was silent as to gains and losses); *Grecian v. Grecian*, 140 Idaho 601, 97 P.3d 468, 471 (Idaho App.2004) (holding that the wife was not required to share in the loss where the value of the plan had declined by thirty percent due to a falling stock market during the eight-month delay between entry of the QDRO and the entry of the divorce decree). The principle that emerges from these cases is that, absent express language stating otherwise or some inequitable conduct by one party causing a protracted delay, a settlement agreement dividing a pension plan implicitly contemplates that both parties will share all of the rewards and risks associated with an investment plan.

 When the principle is applied to the present case, the circuit court clearly erred when it construed the parties' settlement agreement and the QDRO as awarding appellee a fixed sum of appellant's retirement account. The parties agreed that, after subtracting any premarital balances, each would receive *one-half* of all accounts in either party's name based upon the account balances as of the May 30, 2007 execution of the agreement. The QDRO sets forth the percentage appellee was awarded as 38.551 percent as of the execution date. Both the settlement agreement and the QDRO awarded appellee a *percentage* of appellant's retirement account, not a fixed sum. If the parties had intended for appellee to receive a fixed sum from appellant's retirement account, it would have been easy for the parties to do so. It was undisputed that Charles

Haynes, the accountant for the plan, followed the QDRO when he created a separate account on the plan's books in appellee's name. Haynes awarded appellee a share valued at $319,097.81 as of the May 30, 2007 date specified in the settlement agreement. The fact that appellee disputed the amount she received and did not formally request distribution of the funds until February 2009, after the market had declined, does not mean that she was not the owner of those funds or that her share was not subject to increase or decrease the same as any other plan participant. Appellee testified that she knew that the value of the plan could increase or decrease. A court may not use the mechanism of construction to review an unambiguous contract in order to relieve a party from any disadvantageous terms to which the party has agreed; nor may a court revise a divorce judgment with respect to a final property division. *Rogers v. Rogers*, 83 Ark. App. 206, 121 S.W.3d 510 (2003).

Appellee argues that the circuit court should be affirmed because, in accordance with the parties' agreement, it awarded her one-half of the balance of the account as of May 30, 2007. We disagree. The "based upon the balances as of the date of execution" language in the settlement agreement does not establish that the parties agreed that appellee was to receive a fixed sum. The specification of a valuation date does not act to bar appellee from sharing in the growth or loss in the plan attributable to her share; instead, it merely provides a mutually agreed upon base amount to which any growth is added or loss is subtracted and bars appellee from benefitting from any contributions appellant makes to the plan after the valuation date. *See Shorter*, 851 N.E.2d at 386 (quoting *Niccum v. Niccum*, 734 N.E.2d 637, 640 (Ind.Ct.App.2000)). Otherwise, the effect would be to award one party the

gains or losses generated by another party's assets. *See Gardner v. Gardner,* 973 S.W.2d 116, 127 (Mo.App.1998).

Appellee asserted in the present case that appellant was responsible for the delay in her receiving her distribution of the funds because he refused to sign the necessary paperwork. The circuit court held otherwise, finding that appellee disagreed with the amount of her share as determined by the plan's accountant and refused to request a distribution because of that disagreement. Moreover, appellee admitted that she did not submit a written request for her share to be distributed to her until February 2009.

Appellee also relies on parol evidence that she asserts shows that the parties intended to equally divide their accounts as of the date of their settlement agreement. The reliance on such evidence is misplaced. The court found that the agreement was unambiguous. Yet, the court considered extrinsic evidence as to the parties' intent. Parol evidence is inadmissible except when a written agreement is ambiguous or when necessary to bring out a latent ambiguity. *Oliver v. Oliver,* 70 Ark. App. 403, 19 S.W.3d 630 (2000). Appellee does not argue that the agreement was ambiguous.

Reversed and remanded.

GLADWIN and BAKER, JJ., agree.