2011 Ark. App. 361

**Daniel Ray HORTON, Appellant**

v.

**Virginia Ruth HORTON, Appellee.**

**No. CA 10–874.**

Court of Appeals of Arkansas.

May 11, 2011.

Debra Joan Cheatham Reece, Russellville, for appellant.

John David Coulter, Little Rock, for appellee.

WAYMOND M. BROWN, Judge.

This appeal involves the division of property and debt after a divorce. Daniel Ray Horton brings this appeal from the Pulaski County Circuit Court's decree ending his marriage to Virginia Ruth Horton. For reversal, Mr. Horton contends that the circuit court erred by (1) denying his motion for a new trial because he was denied the opportunity for a fair trial and an opportunity to present his case; (2) finding that a home Mrs. Horton owned before the marriage was Mrs. Horton's separate property; (3) requiring him to pay all of the parties' 2008 tax liability and not addressing the parties' 2009 and 2010 tax liability; and (4) denying his motion for reconsideration because the parties' financial circumstances had changed due to the passage of time between trial and the entry of the decree. We disagree with all of Mr. Horton's points. Accordingly, we affirm.

*Background*

The parties separated in May 2007 after thirty-three years of marriage, and Mrs. Horton filed her complaint for divorce on October 14, 2008. A hearing was held on the divorce complaint on February 4, 2009. Mrs. Horton testified that she was seventy years old and had suffered a stroke in 2000. The stroke affected her speech and the right side of her body. She was unemployed because of her physical limitations, having last been employed in a clerical position in 1989. Mrs. Horton testified that she requires twenty-four hour care, which she had before moving into an as-

sisted-living facility that costs approximately $2900 per month. Her medications cost $420 per month. Her sole source of income was $840 per month in Social Security benefits. Mr. Horton was paying her living expenses with a credit card or by withdrawals from a retirement account.

When the parties married, Mrs. Horton owned her own home. The home was sold in November 2008, netting $64,600 in profit. The parties paid off the mortgage together after their marriage in 1974. Mrs. Horton also said that the parties agreed to form a trust and that the house was transferred to that trust. She also testified about the parties' marital home. The home was sold in July 2008 and the net proceeds of $47,000 were placed in the parties' joint checking account. She withdrew $14,500 of the proceeds for her use. The parties also had two retirement accounts with Smith Barney that had a balance of approximately $146,000 as of January 31, 2009. Mrs. Horton testified that she never made withdrawals from these retirement accounts. The parties also had a joint checking account with a balance of approximately $5000, and another retirement account of which she did not know the balance. After saying that she had no interest in owning any of the parties' vehicles, Mrs. Horton proposed that she receive 58% of the parties' bank, retirement, and investment accounts. According to Mrs. Horton, Mr. Horton was still employed and did not have any physical limitations or significant health expenses. Mrs. Horton also acknowledged that Mr. Horton paid for her care and living expenses from marital funds. She also asserted her belief that Mr. Horton wasted marital assets in his use of credit cards.

Mr. Horton testified that he was living with his first wife, paying her $400 per month in rent. He was employed part-time as a project manager and had been with his employer for nineteen years. He earned $300 per day, plus expenses, on days he traveled and $400 per day for work days. Later in his testimony, Mr. Horton testified that his work was reduced to one week per month and that he was transferred to a different department. He stated that his net pay was reduced to $1100 per month.

Mr. Horton discussed his December 29, 2008 affidavit of financial means. His net take-home pay was $4400 per month. He also received $1550 in Social Security benefits, which increased to $1612 in 2009. He testified that his wages from the 2007 tax return were $50,303. He also had approximately $27,000 in his Social Security benefits. His 2008 income was similar. Mr. Horton testified that, although his doctor had not restricted his physical activities, he could no longer golf, jog, or do other things like he formerly could. He testified that the parties' tax returns showed distributions from the IRA of approximately $230,000 for the years 2005 through 2007. Another $75,000 was distributed in 2004. As of May 31, 2007, the balance of the IRA was approximately $345,000. By January 31, 2009, the balance had declined to $146,000. Although acknowledging that his deposition testimony was different, Mr. Horton denied gambling every chance he could. Mr. Horton's testimony was conflicting on the amount of money he lost gambling, both denying and admitting that he had lost thousands of dollars. He acknowledged that the money for his gambling came from marital funds. He said that he had won some money, but denied that he had lost $100,000. Mr. Horton also denied that his gambling had an effect on his finances.

Mr. Horton stated his belief that Mrs. Horton's home should be considered marital property because twenty years of mortgage payments were made out of marital

funds. He also said that the house was conveyed into a trust where the parties agreed that they would share the property equally. Neither the trust documents nor the deed was introduced into evidence.

On February 27, 2009, Mr. Horton's attorney wrote a letter to the circuit court enclosing the credit card and bank statements that had been requested by the court. The statements covered the period of May 2007 through January 2009. Also included were the parties' 2008 federal and state tax returns. The attorney also requested a "short" hearing to present testimony and argument about Mr. Horton's gambling, the parties' tax debt, preservation of marital funds, the factors for the division of property, the value of the vehicles, and whether Mrs. Horton's house was converted to marital property.

On April 14, 2009, the circuit court, after receiving an April 10, 2009 letter from Mr. Horton's attorney, entered an order directing Mr. Horton to pay the parties' state and federal tax liability of approximately of $35,000 out of the proceeds from the sale of Mrs. Horton's home. The order also stated that the issues of whether the proceeds were marital property and the ultimate responsibility for the tax liability would be reserved for later determination.

On June 29, 2009, the circuit court issued a letter opinion announcing its decision in the case. The court found that, although Mr. Horton testified that he helped work on the house, he offered no details and did not provide any records tracing how the mortgage was paid or how he was responsible. Therefore, the court awarded the entire proceeds to Mrs. Horton. The court ordered that Mr. Horton be responsible for the entire amount of the parties' 2008 tax liability and that it be deducted from Mr. Horton's share of the parties' investment accounts. The court then found that the proceeds of the marital home should be divided equally between the parties. The court then made an unequal division of the parties' retirement and bank accounts so that Mrs. Horton received 58% and Mr. Horton 42%. This was based on the factors found in Arkansas Code Annotated section 9–12–315(a)(1)(A).[1] The court noted that the parties had been married for thirty-three years, that they were in their seventies, that Mr. Horton was still employed, and that Mrs. Horton was infirm and could not work.

On July 7, 2009, Mr. Horton filed a motion seeking to set aside the court's letter opinion and have another hearing to address certain unspecified issues. In his motion, he claimed that he had not had an opportunity to complete the presentation of his case and had not rested. Mr. Horton also objected to the court's division of marital property and the designation of Mrs. Horton's home as non-marital property.

Mrs. Horton's counsel submitted a letter dated July 8, 2009, in which he advised that a further hearing was not necessary for the court to resolve the outstanding issues. In a responsive motion, Mrs. Horton further asserted that Mr. Horton had not identified what issues Mr. Horton believed had not been addressed by the court's letter opinion. By order entered

---

1. These factors are: (1) the length of the marriage; (2) age, health, and station in life of the parties; (3) occupation of the parties; (4) amount and sources of income; (5) vocational skills; (6) employability; (7) estate, liabilities, and needs of each party and opportunity of each for further acquisition of capital assets and income; (8) contribution of each party in acquisition, preservation, or appreciation of marital property, including services as a homemaker; (9) the federal income tax consequences of the court's division of property.

on July 13, 2009, the circuit court granted the motion to set a hearing. However, the court limited the hearing to the presentation of testimony concerning the documentary evidence submitted to the court.

The court held another hearing on November 16, 2009. Mr. Horton was the sole witness. According to Mr. Horton, the sale of Mrs. Horton's house resulted in approximately $48,000 of capital gains. The tax on the gain was approximately $9000. Mr. Horton stated his belief that the proceeds from the sale of the house were marital property and that the capital gains tax should be equally divided. If the house was not deemed marital property, he wanted the tax paid out of the sale proceeds. Mr. Horton offered to pay for all of the credit cards except for the Chase account in Mrs. Horton's name because Mrs. Horton was still making charges on that account. He would not admit withdrawing $225,000 from the retirement accounts since May 2007, but acknowledged he had withdrawn at least $190,000. Although Mr. Horton was not aware of exactly how much he had borrowed from credit cards for gambling, he estimated that the sum was between $8000 and $10,000 for the previous five years. He stated that it was impossible to get an accurate picture because the bank statements only showed the withdrawals he made, not his winnings. In 2008, Mr. Horton showed documented winnings of $4365, with other undocumented winnings. He claimed winnings of approximately $5700 on his 2007 return, adding that tax forms were only issued on jackpots of over $1200. Mr. Horton testified that not all of the decline in the account balances was attributable to withdrawals; some was the result of market losses. Mr. Horton also said that he sometimes used money from one credit card to pay off another, higher interest credit card. According to Mr.

Horton, his monthly income consisted of net wages of $1100 and Social Security benefits of $1600. He said that the parties' combined living expenses were $7000 per month, with his expenses being $1900 per month. He had withdrawn $55,000 from the retirement account as of the time of the hearing and expected the total withdrawals for the year to be approximately $75,000.

On March 11, 2010, the court issued another letter opinion in which it confirmed the decision reached in its earlier June 2009 letter opinion. The court noted that Arkansas Code Annotated section 9–12–315 allowed the court to make an unequal division of property based on consideration of certain listed factors. The court then proceeded to discuss those factors, finding that the parties had been married for thirty-three years; that Mrs. Horton had suffered a stroke and was living in an assisted-living facility; that Mr. Horton was employed and earns a salary in addition to his social security benefits; that Mrs. Horton was not employable and had social security for her sole income; that Mr. Horton had greater opportunity to acquire capital assets and income; and that Mrs. Horton contributed to the acquisition of marital property during the marriage. The court noted that it was addressing the issue of credit card debt that had not been resolved in the earlier letter opinion. Mrs. Horton was to be responsible for one credit card, and Mr. Horton was to be responsible for the remaining debt. The court's written decree was entered on March 31, 2010.

On April 9, 2010, Mr. Horton filed a motion for reconsideration and to set aside the property division. On April 14, 2010, he filed a motion for new trial. The motions were not acted upon and were, there-

fore, deemed denied after thirty days.[2] Mr. Horton filed his notice of appeal on May 28, 2010.

### Motion for New Trial

Mr. Horton first argues that the circuit court abused its discretion in denying his motion for a new trial because he was not allowed to present his case-in-chief at the first hearing and was not allowed to complete the presentation of his case at the second hearing. The decision to grant or deny a new trial under Rule 59(a) is within the discretion of the circuit court, and that decision will not be reversed absent a manifest abuse of discretion, that is, discretion exercised thoughtlessly and without due consideration.[3]

Our supreme court has explained that a moving party under Rule 59(a) must demonstrate that its rights have been materially affected by demonstrating that a reasonable possibility of prejudice has resulted from the error.[4] Before listing the various grounds for a new trial, the rule provides that "[a] new trial may be granted to all or any of the parties and on all or part of the claim on the application of the party aggrieved, for any of the following grounds *materially affecting the substantial rights of such party* " (emphasis added).

Mr. Horton relies upon Rule 59(a)(1), which allows the circuit court to grant a new trial for "any irregularity in the proceedings or any order of court or abuse of discretion by which the party was prevented from having a fair trial[.]" Mr. Horton's argument is that he was not allowed to present his case on the property or debt issues. We disagree. At the close of the February 2009 hearing, the circuit court asked Mr. Horton's attorney what else the attorney wanted in the way of testimony. The attorney said that there might be some issues in the credit card and bank statements that needed further explanation. There was also a discussion between the court and Mr. Horton's counsel over the status of Mrs. Horton's home, with the court indicating that the only issue was the division of property, including the proceeds from the sale of Mrs. Horton's home. Mr. Horton did not indicate that there were other issues to be resolved. Mr. Horton's attorney later pointed out that there were other vehicles and other unspecified property not discussed at that hearing. The other vehicles were discussed briefly between the court and Mr. Horton. The court noted that the case was just about the marital property and whether there would be an unequal division of that property. The only other issues that counsel mentioned when the second hearing was held were the issues of taxes and Mr. Horton's testimony concerning the status of Mrs. Horton's home.

The only evidence that Mr. Horton argues that he was prevented from presenting was documentation of the conveyance of Mrs. Horton's home to the trust. But the court had already heard Mr. Horton's testimony that marital funds were used to pay off the mortgage and that the home had been conveyed to the trust. The court also explained to Mr. Horton that it was not dealing with the status of the house itself because the house had been sold;

---

2.  *See* Ark. R.App. P.-Civ. 4(b)(1).

3.  *See, e.g., Roberts v. Boyd*, 94 Ark.App. 345, 230 S.W.3d 301 (2006); *D.B. & J. Holden Farms Ltd. Partnership v. Ark. State Hwy. Comm'n*, 93 Ark.App. 202, 218 S.W.3d 355 (2005).

4.  *Jones Rigging & Heavy Hauling, Inc. v. Parker*, 347 Ark. 628, 66 S.W.3d 599 (2002); *Ford Motor Co. v. Nuckolls*, 320 Ark. 15, 894 S.W.2d 897 (1995).

rather, the court was only interested in the division of the proceeds. At the November 2009 hearing, the parties' 2008 tax return was received into evidence. Mr. Horton also testified as to the gain realized by the sale of Mrs. Horton's house and the tax consequences as a result of that gain. After Mr. Horton testified at the end of the November 2009 hearing, his attorney advised the court that there were no other witnesses.

Based upon the foregoing, we cannot say that Mr. Horton established that his right to a fair trial was materially affected. We affirm on this point.

### Division of Marital Property and Marital Debt

We will discuss Mr. Horton's second, third, and fourth points together because they all relate to the division of the marital estate and marital debt. For his second point, Mr. Horton argues that the circuit court erred in finding that Mrs. Horton's home that she owned prior to her marriage to Mr. Horton was her separate property because the house had been conveyed to a trust the parties established and because marital funds had been used to retire the debt on the property. Mr. Horton's third point is that the circuit court's order that he be responsible for all of the parties' 2008 tax liability is clearly erroneous because that liability included capital gains taxes from the sale of the home Mrs. Horton owned prior to the marriage. Mr. Horton's fourth point is that the delay between the hearings and the entry of the decree rendered the property division inequitable in that Mr. Horton's income had drastically changed.

We review division-of-marital-property cases de novo; however, we will affirm the circuit court's findings of fact unless they are clearly erroneous, or against the preponderance of the evidence; the division of property itself is also reviewed, and the same standard applies.[5] A finding is clearly erroneous when the reviewing court, on the entire evidence, is left with the definite and firm conviction that a mistake has been made.[6]

Under Arkansas Code Annotated section 9–12–315 (Repl.2009), all marital property shall be divided equally between the parties unless the circuit court finds such a distribution would be inequitable. Section 9–12–315(b)(1) excludes property that was acquired prior to the marriage from the definition of marital property. In the event that the circuit court reaches the conclusion that an unequal distribution is warranted, it is allowed, after considering specific factors, to make any division of the property that it deems equitable. Section 9–12–315, however, does not compel mathematical precision in the distribution of property; it simply requires that marital property be distributed equitably.[7]

Mr. Horton relies on two facts to argue that Mrs. Horton's home was marital property. The first is the purported conveyance of the home by Mrs. Horton to a trust established by the parties. Although Mrs. Horton testified that she agreed to convey the property to the trust, no documentation was introduced at either hearing. Mr. Horton attached copies of a 1997 warranty deed conveying the property to the Horton Family Trust to his motion for a new trial. He also attached a copy of the trust document to his motion for a new trial. But such evidence cannot

5. *Gilliam v. Gilliam*, 2010 Ark. App. 137, 374 S.W.3d 108.

6. *Id.*

7. *Williams v. Williams*, 82 Ark.App. 294, 108 S.W.3d 629 (2003).

be used as a basis for a new trial, as a motion for a new trial cannot be used to bring into the record that which does not otherwise appear in the record.[8]

■ We need not decide whether Mrs. Horton made a conveyance of her house to the parties' trust. But even if we were to hold that the conveyance resulted in the house becoming marital property, the circuit court was still empowered to make an unequal division of the marital estate, including awarding Mrs. Horton all of the proceeds from the sale of her house.[9]

■ The second fact Mr. Horton relies on is that marital funds were used for twenty years to pay off the mortgage on the home. But the fact that marital funds were used to pay off the mortgage loan does not automatically convert the house into marital property. In *Farrell v. Farrell*[10] and *Box v. Box*,[11] the supreme court held that property owned by one spouse prior to the marriage did not become marital property solely by having debt on the property paid from marital funds. It is also important to note that Mr. Horton offered no evidence as to the amount of marital funds used to pay off Mrs. Horton's mortgage. There was testimony that, at the time the parties were married, twenty years remained on the thirty-year mortgage; however, the current marital-property statute was not enacted until 1979, after the parties were married.[12]

■ We are mindful that, under *Box*, Mr. Horton would be entitled to some consideration in the property division by virtue that marital funds were used to pay off part of the mortgage on Mrs. Horton's separate property. But that does not mean that an unequal property division is inequitable. The circuit court complied with section 9–12–315 when it discussed the factors that went into its decision to make an unequal division of the marital property. The court was also concerned that Mr. Horton could not explain how much money was spent on Mr. Horton's gambling. According to Mr. Horton's testimony, approximately $248,000 was withdrawn from the parties' retirement accounts between the time Mrs. Horton entered the assisted-living facility in May 2007 and the time of the second hearing in November 2009. During that period, Mrs. Horton's expenses for the assisted-living facility totaled approximately $114,700 ($3000 per month for her care plus $700 per month for her medications and other expenses for 31 months). Mr. Horton testified that his monthly expenses totaled approximately $1900 per month and that he withdrew $7000 per month from the retirement accounts. There was also testimony from Mr. Horton that the balance in the parties' joint checking account was reduced from $14,500 at the time of the February hearing to $250 at the time of the November hearing. Mr. Horton offered no good explanation as to where the money was going except that he was using some of it to pay off the credit cards. There was evidence from which the circuit court could have concluded that the loss

---

8. *Slaton v. Slaton*, 330 Ark. 287, 956 S.W.2d 150 (1997); *Sharp County v. Northeast Ark. Planning and Consulting Co.*, 269 Ark. 336, 602 S.W.2d 627 (1980); *Stickels v. Heckel*, 2009 Ark. App. 829, 370 S.W.3d 857; *Whisnant v. Whisnant*, 68 Ark.App. 298, 6 S.W.3d 808 (1999).

9. *Gilliam, supra.*

10. 365 Ark. 465, 231 S.W.3d 619 (2006).

11. 312 Ark. 550, 851 S.W.2d 437 (1993).

12. *See generally Day v. Day*, 281 Ark. 261, 663 S.W.2d 719 (1984) (setting out the history of Act 705 of 1979).

of marital assets by Mr. Horton's gambling offset the payment of the mortgage on Mrs. Horton's home with marital funds. Moreover, Mrs. Horton declined to take one of the parties' three vehicles, given that she was physically unable to drive. Mr. Horton was getting the vehicles free of any debt.

The fact that the parties' 2008 tax liability also included taxes on the capital gains from the sale of Mrs. Horton's home does not compel the conclusion that the circuit court's assignment of that liability to Mr. Horton was clearly erroneous. The court has the authority to assign tax liability between divorcing parties and that decision must stand unless it is arbitrary and groundless.[13] Mr. Horton's income totaled some $2700 per month, while Mrs. Horton's income was approximately $850 per month. A decision based on the disparity in income between the parties cannot be said to be arbitrary or groundless.

Mr. Horton also argues that the circuit court erred in not addressing the parties' 2009 and 2010 tax liabilities. Mr. Horton raised this argument for the first time in the motion for a new trial. Our supreme court has stated that an issue must be presented to the circuit court at the earliest opportunity in order to preserve it for appeal.[14] Any error argued on appeal must have first been directed to the circuit court's attention in some appropriate manner, so that the court has an opportunity to address the issue.[15] A party cannot wait until the outcome of a case to bring an error to the circuit court's attention.[16] Stated another way, a circuit court does not abuse its discretion by denying a posttrial motion seeking to raise an issue that was not raised at trial.[17]

Finally, the delay between the second hearing in November 2009 and the entry of the decree in March 2010 does not warrant reversal. First, Mr. Horton was able to testify at both hearings that his net earnings were reduced to approximately $1100 per month. Any other change in Mr. Horton's circumstances is not specified, either in the letter to the court or in the brief. Moreover, by awarding Mrs. Horton 58% of the retirement and bank accounts instead of a specific sum, the circuit court was taking into consideration any fluctuations in the market.[18]

In light of the economic disparities between the parties, the circuit court's unequal division of the property was not clearly erroneous. We affirm.

Affirmed.

WYNNE and ABRAMSON, JJ., agree.

13. *Skokos v. Skokos*, 344 Ark. 420, 40 S.W.3d 768 (2001); *Rudder v. Hurst*, 2009 Ark. App. 577, 337 S.W.3d 565.

14. *LaFont v. Mixon*, 2010 Ark. 450, 374 S.W.3d 668.

15. *Stacks v. Jones*, 323 Ark. 643, 916 S.W.2d 120 (1996).

16. *Jones v. Double "D" Props., Inc.*, 352 Ark. 39, 98 S.W.3d 405 (2003).

17. *Cochran v. Bentley*, 369 Ark. 159, 251 S.W.3d 253 (2007); *Williams v. First Unum Life Ins. Co.*, 358 Ark. 224, 188 S.W.3d 908 (2004).

18. *See Duncan v. Duncan*, 2010 Ark. App. 561, 377 S.W.3d 431, *rev. granted, Duncan v. Duncan*, No. 10–966 (Ark. Feb. 24, 2011).