375 Ark. 446

**Katie Zimmerebner STEHLE,
Appellant,**

v.

**Ernest William ZIMMEREBNER,
Appellee.**

**No. 08–610.**

Supreme Court of Arkansas.

Jan. 30, 2009.

Lynn Frank Plemmons, Conway, for appellant.

Scarlett R. Melikian, Cabot, for appellee.

ROBERT L. BROWN, Justice.

Appellant Katie Zimmerebner Stehle ("Katie") appealed the order of the circuit judge denying her motion for change of custody of her daughter, KZ, to the court

of appeals.[1] That court reversed the circuit judge's decision and held that Katie should have primary custody of KZ based on a material change of circumstances. The appellee, KZ's father, Ernest William ("Billy") Zimmerebner, petitioned this court for review, and we granted his petition. We affirm the circuit judge's order, and we reverse the decision of the court of appeals.

On October 4, 2001, Katie and Billy divorced, and Katie was awarded primary custody of KZ. On August 27, 2003, the circuit judge held a hearing on Billy's motion to change custody of KZ to him. That motion was granted by an order entered on November 10, 2003, which gave Billy primary custody of KZ, subject to visitation by Katie. On July 25, 2006, Katie moved to change custody back to her and asserted that there had been a material change of circumstances. Those circumstances, she contended, were based on these alleged facts: (1) Billy and his then-wife, now Amber Robertson ("Amber"), had been in a physical altercation, and Amber had filed for divorce;[2] (2) KZ and her stepbrother had to "lay on top of" Amber to "get [Billy] to stop attacking her"; (3) Billy and KZ had been living in Billy's parents' home since March 2006, and the sleeping arrangements were inadequate because KZ and Billy shared a room; (4) Billy did not have his own transportation, but used his employer's vehicle to transport KZ; (5) KZ had been in four different schools since 2003; and (6) on July 2, 2006, Billy dropped KZ at Katie's house for summer visitation with insufficient asthma medication and failed to respond to Katie's calls regarding the matter.

The circuit judge heard Katie's motion on March 20, 2007, and, on March 23, 2007, he issued a letter opinion, giving his reasons for denying it. On April 16, 2007, an order was entered to the same effect. Katie appealed, and on May 21, 2008, a three-judge panel of the court of appeals, in three separate opinions, reversed the circuit judge's order and held that Katie should have primary custody of KZ.

The following facts in the instant case are undisputed. When Billy and Katie divorced in 2001, KZ was age three and under school age. After custody was awarded to Katie, KZ lived with her in Conway. When Billy was awarded custody of KZ in 2003, he enrolled KZ in school in Greenbrier. Toward the end of the school year in 2004, Billy enrolled KZ in a magnet school in Maumelle, where she completed kindergarten and first grade. Shortly after she started the second grade, Billy and Amber moved to Cabot, and KZ attended public school there for the remainder of her second-grade year. KZ returned with her father to Maumelle, after Billy and Amber's marriage dissolved in 2006. KZ was enrolled in the third grade at Academics Plus Charter School in Maumelle, the school she attended at the time of the hearing on the change-of-custody petition.

At the hearing before the circuit judge on March 20, 2007, regarding her motion to change custody, Katie testified to the following:

● Despite her many efforts, she was unable to communicate with Billy about KZ because he would not answer her telephone calls or share information with her regarding KZ's educational or medical issues.

---

1. KZ was born on September 9, 1998, and was eight-and-a-half years old when the judge's order was entered.

2. Billy married Amber on October 19, 2001, and they divorced on December 20, 2006. Billy and Amber separated in March 2006.

- She attended KZ's parent-teacher conferences, class parties, and field trips when she was able and regularly visited KZ at school during lunchtime; Billy did not attend KZ's school functions; rather, Amber had handled those matters.[3]
- KZ was on the honor roll and got As and Bs at school.[4]
- She had often been delinquent in paying Billy court-ordered child support but had paid her arrearages and was current at the time of the hearing.
- On one occasion, Billy dropped KZ off for visitation with inadequate medication, and she had to pay to have it refilled because KZ was no longer receiving medical insurance through the state-funded AR Kids program.
- When she filed the motion, Billy only had one vehicle, insured for work purposes, and, therefore, lacked adequate means to transport KZ.[5]
- After Billy and Amber separated, KZ remained with Amber for six weeks, and Katie was not notified.
- She had remarried and had another child since custody was awarded to Billy.
- She and her husband had recently purchased a newly-constructed house in Vilonia, where KZ had her own room.
- KZ had bonded with her younger half-sister.
- If granted custody, Katie would allow KZ to finish the current school year at the charter school in Maumelle and would consider transferring her to public schools in Vilonia the following year.
- She worked two blocks from the Maumelle charter school, and it would be convenient for KZ to remain enrolled there.
- KZ would attend daycare after school and would return with Katie to Vilonia when she finished work.
- If granted custody, she would keep Billy updated regarding KZ's school and health information.

Amber testified at the same hearing as follows:

- When she and Billy were married, she provided the day-to-day care for KZ and her other children.
- She went to KZ's parent-teacher conferences and other school events without Billy.
- She was responsible for communicating with Katie.
- Billy and his parents, but especially his mother, said bad things about Katie in KZ's presence.
- During the marriage, Billy was abusive to her, and KZ witnessed these acts of violence.[6]
- KZ would sometimes "throw a fit" before going to Katie's house, and once returned "with a large part of her hair missing."

3. Two of KZ's previous teachers testified that Katie was involved with them in KZ's education, and that Billy was not.

4. Katie initially said that KZ's grades were "mediocre" and then acknowledged during cross-examination that she had made honor roll.

5. On cross-examination, Katie testified that she lacked personal knowledge that Billy's work vehicle was insured only for work purposes.

6. Amber recounted one specific incident in which Billy allegedly threw her against the wall, after which KZ and her step brother "threw themselves over" her, and KZ said "don't hurt my mamma anymore."

- She had previously testified against Katie and had since changed her mind about Katie's fitness as a mother.

Billy also took the stand and testified as follows:

- He worked as a plumbing contractor and lived with his parents in their three-bedroom house, in which KZ had her own room.
- His mother took KZ to school each morning, and his father picked her up from school every afternoon.
- He returned most evenings about 30 minutes after KZ got home from school, and then the two of them worked on her homework and read together.
- KZ had always been an honor roll student.
- After finishing her school work, KZ had chores and then often played with her best friend who lived across the street.
- He played on the trampoline with KZ and was teaching her to ride a bike.
- He often did not answer the phone when Katie called because she would call as many as "30 times" in a row and would "threaten" him when he answered.
- He had not said bad things about Katie in KZ's presence and had admonished Amber when she had done so.
- KZ returned many times from Katie's house without having brushed her teeth.
- KZ had "resisted" going to Katie's house and had acted unhappy when she returned from visitation.
- Amber "gets pretty crazy when she gets mad," and he was never violent

toward Amber except as necessary to defend himself.

- He owned a vehicle in addition to his work truck and was insured to use both for personal use.
- When he told Amber he would request custody of their two children, she told him she would testify on Katie's behalf in the instant custody proceeding.[7]

Billy's mother, Debbie Zimmerebner, testified that:

- Billy was very active with KZ and his other two children; KZ and Billy read together every night, played on the trampoline together, and went bike riding.
- Billy made sure KZ was clean and that she had brushed her teeth.
- She had never heard Billy make negative remarks about Katie in front of KZ and he had stopped Amber from doing so.
- Katie called her house "non-stop," after Amber and Billy separated.
- On one occasion, she met Katie in a parking lot to retrieve something KZ needed, and Katie screamed foul language at her.
- Sometimes she referred to Katie as "the witch" but never in KZ's presence.
- KZ had her own bedroom at their house, decorated in "all pink cause that's [KZ's] favorite color."

Finally, Billy's father, David Zimmerebner, told the court under oath that:

- He picked KZ up after work each day, and she would change her clothes, get a snack, and start working on her homework.

---

7. He testified that he responded to her by saying, "After all the times you've bad mouthed [Katie] in court and bad mouthed her to teachers?" According to Billy, her response was, "You're right. The gloves are off."

- He would help her occasionally with her assignments, but sometimes she would "save[ ] it" for when Billy returned from work because "she wanted him to work with her."
- Billy provided the day-to-day necessities for KZ.
- Billy tucked KZ in at night.

After hearing all the testimony, the circuit judge observed from the bench that he was concerned about the lack of stability in KZ's life. He said that it bothered him that Billy had moved with KZ so often and "always seems to find his way back to his mamma and daddy's." He also expressed concern that Katie only paid her child support when she "decided to bring somebody back to court." He concluded the hearing by telling the parties that he was going to "weigh some of this credibility and some of the testimony" and would then make a decision regarding the motion for change of custody.

On March 23, 2007, the circuit judge filed his letter order, outlining his decision to deny Katie's motion. The judge said that he "had an opportunity to review [his] notes, the exhibits, and to reflect" about the best interest of the child in the instant case. He noted his concern that, despite the fact that there are times when Billy does engage and assist with the care of KZ, "if there is somebody else who will do it he is more than willing to turn that task over." The judge commented on Billy's tendency to "abdicate his responsibility as a parent." He made it clear that "there is no question that while the child has been in his custody she has continued to thrive, is a good student, and in spite of the conflicts that have arisen not only between her mother and father but her extended family she has continued to do well."

With respect to Katie, the judge said that she "has stepped up to the plate" and paid the court-ordered child support "when she was in a position to seek relief from the Court." He found that Katie is engaged in KZ's life, attends school functions when she knows of them, and meets KZ for lunch on a frequent and consistent basis. The judge also noted that he was "proud to see that she has since our last hearing taken on a regular job." He found that Katie and her husband had improved their financial situation, bought a house, and made "a home for themselves and" their other child.

The circuit judge next addressed each of the issues Katie raised in her motion for change of custody. With respect to the allegations of violence between Billy and Amber, he said that, while it was "absolutely not" a good situation at the time, there was no testimony that any violence was directed toward KZ, and the "situation has been diffused in that the ex-wife [Amber] is no longer involved." He found that KZ's sleeping arrangements were adequate at Billy's parents' house, and the only concern he had regarding Billy and KZ's living situation was Billy's "tendency to disengage." The judge found Katie's complaint regarding Billy's automobile to be a "nonissue" and was similarly unconcerned with Katie's allegations that Billy brought KZ to her house with inadequate medicine.[8]

The judge noted that "another significant issue in [his] mind" was how many times KZ had moved with Billy since the last order. He observed that when he awarded custody to Billy, "the motivating factor in [his] decision to change custody was the stability Billy seemed to show over Katie." He then said that Billy's "advantage" had "disappeared" due to the fre-

---

8. The judge specifically found that it was an "isolated event" and it was not "threatening to the child, so long as Katie took action and spent money."

quent moves. Nevertheless, he concluded that "the child seems to have adjusted and is currently doing well in the Academic's Plus charter school in Maumelle," and that "her grades seem to speak well of her family's commitment to her education." The judge also noted that the school was close to where KZ was living and to where Katie was working. After laying out his findings, the judge concluded that while he was "not terribly impressed with the parenting skills of either party," it was his "determination that [Katie] has failed to prove that a change of circumstances exists which would justify changing custody of the minor child at this point." Following that, the judge filed an order to that effect on April 16, 2007.[9]

When this court grants a petition for review of a court of appeals decision, we review the case as though it had originally been filed with this court. *See, e.g., Hamilton v. Barrett*, 337 Ark. 460, 462, 989 S.W.2d 520, 521 (1999). It is well settled in Arkansas that a judicial award of custody will not be modified unless it is shown that the circumstances have changed such that a modification of the decree would be in the best interest of the child. *See, e.g., Campbell v. Campbell*, 336 Ark. 379, 383, 985 S.W.2d 724, 727 (1999). In order to avoid the relitigation of factual issues already decided, the courts will restrict evidence on a custodial change to facts arising since the issuance of the prior order. *Id.* at 384, 985 S.W.2d at 727. This court has stated that courts generally impose more stringent standards for modification in custody than for initial determinations of custody in order to promote stability and continuity in the life of the child. *See Alphin v. Alphin*, 364 Ark. 332, 340, 219 S.W.3d 160, 165 (2005). The party seeking modification of the custody order has the burden of showing a material change in circumstances. *Id.*

We have summarized our standard of review for equity cases, and specifically child custody cases, with regard to de novo review and the clearly erroneous standard:

> We review chancery cases *de novo*, but will only reverse if the chancellor's findings were clearly erroneous or clearly against the preponderance of the evidence. A finding is clearly erroneous when the reviewing court, on the entire evidence, is left with the definite and firm conviction that a mistake has been committed. We give due deference to the chancellor's superior position to determine the credibility of the witnesses and the weight to be given their testimony. In cases involving child custody, great deference is given to the findings of the chancellor. This court has held that there is no other case in which the superior position, ability, and opportunity of the chancellor to observe the parties carries a greater weight than one involving the custody of minor children. The best interest of the child is the polestar in every child custody case; all other considerations are secondary.

*See Ford v. Ford*, 347 Ark. 485, 491, 65 S.W.3d 432, 436 (2002) (citations omitted).

We take this opportunity to clarify further our standard of review for child custody cases, as well as other equity cases, and to dispel any confusion that may exist concerning de novo review and our clearly erroneous standard.

---

9. In addition to denying Katie's motion, the judge ordered that both Billy and Katie enroll in and complete a parenting class within six months. He also directed them to attend an anger management class within six months and ordered that a mutual retraining order, prohibiting the parties from calling each other names and degrading each other, be continued. The judge ordered that the parties must "communicate regarding the needs of this child in writing, preferably by email" and the emails should be "short and to the point."

Equity cases are reviewed de novo. *See ConAgra, Inc. v. Tyson Foods, Inc.*, 342 Ark. 672, 30 S.W.3d 725 (2000). This means the whole case is open for review. *Id.* This does not mean, however, and we emphasize this point, that findings of fact by the circuit judge in equity cases are simply dismissed. They are not. The clearly erroneous standard, cited above and set out in our rules of civil procedure, governs if the circuit judge has made findings of fact. As Rule 52(a) states:

> Findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous (clearly against the preponderance of the evidence), and due regard shall be given to the opportunity of the circuit court to judge the credibility of witnesses.

Ark. R. Civ. P. 52(a) (2008).

In determining whether the circuit judge clearly erred in a finding, the appellate court may look to the whole record to reach that decision. *See ConAgra*, 342 Ark. at 674, 30 S.W.3d at 727 (on de novo review of record, court held chancery court clearly erred in finding information at issue qualified as a trade secret); *Ferguson v. Green*, 266 Ark. 556, 587 S.W.2d 18 (1979) (chancery court reached erroneous conclusion based on de novo review of entire record). But, to reiterate, to reverse a finding of fact by a circuit judge, that judge must have clearly erred in making that finding of fact, which means the reviewing court, based on the entire evidence, is left with the definite and firm conviction that a mistake has been made. *Ford*, 347 Ark. at 491, 65 S.W.3d at 436.

To summarize, de novo review does not mean that the findings of fact of the circuit judge are dismissed out of hand and that the appellate court becomes the surrogate trial judge. What it does mean is that a complete review of the evidence and record may take place as part of the appellate review to determine whether the trial court clearly erred in either making a finding of fact or in failing to do so.

In the instant case, it is abundantly clear to this court that the circuit judge's findings, supporting his denial of Katie's motion for change of custody, were not clearly erroneous. We acknowledge, and it is beyond dispute, that some circumstances have changed since Billy was awarded custody. Billy moved frequently with KZ, he and Amber divorced following alleged physical conflict in their marriage, and Katie remarried and improved her financial situation. Despite these facts, the circuit judge found that they did not constitute a material change in circumstances so as to militate a grant of physical custody of KZ to Katie. To repeat, the judge specifically found that, while the parenting skills of both Katie and Billy needed improvement, KZ "has continued to thrive" in Billy's custody and was "adjusted and is currently doing well" in school. He also observed that the school is "close to where the child is living and is also close to where the child's mother works."

What is particularly meaningful to this court is that the circuit judge has had these parties before him for many years, going back to Katie and Billy's divorce in 2001. He has heard from the various witnesses on multiple occasions and was in a much better position than this court to observe their demeanor and assess their credibility. *See Ford*, 347 Ark. at 491, 65 S.W.3d at 436 (in custody cases it is especially important to give great weight to the trial court's superior position to observe the parties). In the instant case, the judge dutifully took the matter under advisement in order to review his notes, the exhibits, and to reflect on the testimony in order to determine whether the motion should be

granted. The resulting letter order specifically responded to each of Katie's concerns and directed the parties to take various actions to "improve the situation."

In sum, we hold that the circuit judge did not clearly err in finding that Katie failed to prove a material change of circumstances so as to justify a change of custody for KZ. We are particularly swayed by the circuit judge's finding that KZ has continued to thrive in Billy's custody and is a good student despite conflicts between Billy and Katie.

We affirm the order of the circuit judge and reverse the court of appeals.

Affirmed. Court of appeals reversed.