2011 Ark. 348

**Mark F. DUNCAN, Appellant**

v.

**Cheryl Ann DUNCAN, Appellee.**

No. 10–966.

Supreme Court of Arkansas.

Sept. 15, 2011.

Terry J. Lynn, Heber Springs, for Appellant.

JIM GUNTER, Justice.

Appellant Mark Duncan appeals from an order and judgment of the Cleburne County Circuit Court finding him personally liable to Appellee Cheryl Duncan for $115,936.81, representing the decrease in market value of her half of appellant's retirement account following their divorce. The Arkansas Court of Appeals reversed the circuit court's decision in *Duncan v. Duncan*, 2010 Ark. App. 561, 377 S.W.3d 431. Because we granted appellee's petition for review, our jurisdiction is pursuant to Rule 1–2(e) of the Rules of the Arkansas Supreme Court. Upon the grant of a petition for review, we consider the case as though it had been originally filed in this court. *Powell v. Lane*, 375 Ark. 178, 289 S.W.3d 440 (2008).

Appellee filed for divorce in November 2006, and on May 30, 2007, the parties entered into a property-settlement agreement, which included the following provision:

> 13. **Other Accounts.** Each party shall receive one-half (½) of all vested retirement, profit sharing, 401K, stock, or other accounts in their joint or individual names accumulated during the marriage based upon the balances as of the date of execution of this Agreement. Each party shall receive as his or her separate property an amount equal to the balance of each account, if any, at the time of the marriage.

> [Appellant] is currently vested in a tax qualified retirement or profit sharing account through his employer, which account is with State Farm Insurance Company and is being managed by . . . a local agent. From the balance of this account as of the date of execution of this Agreement shall be deducted the balance of [appellant's] tax qualified retirement or profit sharing account as of the date of the marriage of the parties (the "premarital amount"), which amount shall be [appellant's] sole and separate property, with the remaining balance being divided equally between the parties, with [appellee's] portion being rolled over into a individual retirement account or other I.R.S. qualified account of [appellee's] choice, any taxes or penalties arising from such transaction being the responsibility of [appellee].

> Likewise, the State Farm Account in the name of [appellee] shall be divided in the same manner, giving her credit for the balance as of the date of the marriage (the "premarital amount") and the balance, if any, being rolled over into a individual retirement account or other I.R.S. qualified account of [appellant's] choice, any taxes or penalties arising from such transaction being the responsibility of [appellant].

> If necessary, a Qualified Domestic Relations Order within the meaning of Section 206(d) of the Employee Retirement Income Security Act of 1974 and Section 414(p) of the Internal Revenue Code of 1954, both as amended by the

Retirement Equity Act of 1984 shall be entered and both parties agree to cooperate and provide any necessary information to carry out the division of these accounts.

On June 14, 2007, appellant counterclaimed for divorce, and appellee withdrew her complaint and entered a waiver of service and waiver of entry of appearance. Thereafter, the circuit court entered a divorce decree on June 15, 2007, incorporating and adopting the property-settlement agreement but not merging it into the decree. On August 23, 2007, the circuit court entered a Qualified Domestic Relations Order (QDRO), which provided as follows:

6. This Order, in accordance with the Property Settlement Agreement between the parties, hereby assigns to Alternate Payee [appellee] 38.551% of the account balance as of May 30, 2007, which represents fifty percent (50%) of the Participant's |₃[appellant's] account balance on that date after deducting the premarital account balance.

7. A distribution to the Alternate Payee of the amount provided for in this Order in the form of a single sum distribution shall be made as elected by the Alternate Payee after this Order is determined to be qualified by the Plan Administrator.

. . . .

11. · Upon the division of the Participant's account as provided for herein, the Alternate Payee shall have no further right, title or interest in and to the Participant's account, or any increase in the value thereof, and the same shall constitute the sole and separate property of the Participant. Similarly, upon such division, the Participant shall no longer have any interest in that portion of the account as is hereby assigned to the Alternate Payee, and such assigned portion of the account, including any increase in the value thereof, shall constitute the sole and separate property of the Alternate Payee. In the event the Plan overpays benefits to either the Participant or the Alternate Payee, the Participant or the Alternate Payee, as the case may be, shall repay such excess payment to the Plan, and the Plan shall be entitled to recovery of such overpayment.

On October 22, 2007, appellee filed a motion for contempt and to enforce the decree and property-settlement agreement, asserting that appellant had failed to comply with several conditions of the decree and agreement. That motion made no allegations or reference to any conflict between the parties with regard to the division of appellant's pension and profit sharing plan held with State Farm ("retirement plan"). The parties entered an agreed order on February 25, 2008, settling their dispute.[1]

On October 9, 2008, appellee filed a petition for citation for contempt and judgment, |₄alleging that appellant had failed and refused to sign the documents necessary to transfer her interest in appellant's retirement plan to a separate account that she controlled. Appellee asked the court to award her $319,000, which she maintained represented the value of her inter-

---

[1]. In that order, the parties agreed that appellant owed appellee $47,862 for tax refunds, attorney's fees, and credit-card debt pursuant to their property-settlement agreement; that appellee's State Farm investment account had a balance of $140,995.28 as of May 30, 2007; that pursuant to the agreement, appellee's State Farm account was to be divided equally between the parties; and that the amount appellant owed to appellee would be deducted from his share of appellee's State Farm account, leaving an amount due by appellee of $22,635.64. It is undisputed that appellee paid appellant that amount.

est in appellant's retirement plan as of May 30, 2007, plus interest and attorney's fees. Appellee filed amended petitions on December 18, 2008, and on May 5, 2009, seeking additional monies against appellant unrelated to the retirement plan and adding appellant, in his capacity as administrator of the retirement plan, and the retirement plan itself as parties. On February 13, 2009, appellee had transferred a "partial payment" of $203,161 to a separate account at another bank.

At a hearing conducted on July 8, 2008, appellee testified that she believed she was to receive half of appellant's retirement plan according to the property settlement, and that after the QDRO was filed, she learned the amount of her half was approximately $319,000. She claimed that she immediately attempted to transfer her portion into an account of her choosing but that she was informed by the State Farm agent that appellant had to approve of any transfer. However, appellee admitted that she requested her funds several times and when told the value was approximately $319,000, she refused it because she believed her portion was closer to $400,000. Appellee acknowledged that she was aware the funds were invested and that they were vulnerable to an increase or decrease in value depending on the market. She testified that she had contact with the State Farm agent and the retirement plan's accountant but never with appellant or the attorney representing the retirement plan. Appellee admitted that she eventually agreed that she was owed approximately $319,000 but that she received only a partial payment of that amount.

Charles Haynes, accountant for the retirement plan and personal accountant for appellant and appellee, testified that after he received the QDRO, he requested a statement from State Farm; calculated appellee's 38.551% share of the retirement account as of May 30, 2007; determined the market value of her percentage of shares as $319,097.54; and immediately segregated that amount into a separate account in her name. Haynes stated that the value of appellee's account would fluctuate daily depending on the market.[2] Haynes acknowledged that a party to a property-settlement agreement cannot be paid on the date of settlement and that there would be a "time lag" in apportioning the funds. He testified that during August and September 2007, after the QDRO had been entered and implemented, appellee disputed the market value figure Haynes had calculated. Haynes stated that he continued to come up with the same figure after recalculating. He characterized the situation as a "stand off" and stated that it was difficult to distribute the funds when an agreement could not be made regarding the amount.

Melanie Strigel testified that as attorney for the retirement plan, she reviewed the QDRO before Mr. Haynes implemented it. She explained that once appellee's portion of the retirement plan was segregated by the accountant, appellant had no control over it other than his control over the plan in his role as plan administrator. Strigel stated that in her experience, the way that Mr. Haynes handled the account and implemented the QDRO was appropriate. Strigel explained that the retirement plan's summary plan description, article 8, section 2.8.1, provides that any earnings, gains, or losses are to be allocated among each account, including any segregated accounts, proportionate to the account bal-

<hr/>

2. Haynes testified that the $203,161 appellee accepted in February 2009 was actually slightly more than the amount she was entitled to due to a miscalculation (two-tenths of one percent) and that she was overpaid approximately $3869.64.

ance as compared to the total trust-fund balance. Strigel noted that if appellee had requested and obtained transfer of her segregated account around the time of the QDRO, her payment would have been very close to the $319,000 figure; however, due to the stock market's drop, her eventual payout in February 2009 reflected those losses. Strigel testified that appellee was not required to do anything to have her interest in the retirement plan segregated into her account; once the QDRO was entered and accepted, it operated to require the setting up of the segregated account. Strigel stated that once appellee had a separate account, she could leave it with the retirement plan, transfer it to another plan, or cash it out. Regardless, the value of it on any given day would be determined by the market.

Louis Lee, the State Farm agent who represented the retirement plan, testified that he needed signatures from both appellant and appellee to effectuate a transfer of appellee's portion of the plan. He stated that appellant signed a distribution request form in April 2008; that the value of appellee's interest in the retirement plan was noted on that form as approximately $319,000; that appellee disputed the amount and believed it to be closer to $400,000; and that appellee did not sign the form and Lee could not go forward with a transfer.

Appellant also testified and stated that he signed a distribution request form in April 2008 authorizing the transfer of funds from his retirement plan to appellee. He testified that he did so a few weeks after appellee had paid him the money she owed for his share of her ₁₇State Farm investment account and that his purpose was to settle the matter in accordance with their property-settlement agreement.

The circuit court entered a letter opinion on August 31, 2009. It found that the terms of the parties' property-settlement agreement were unambiguous, but it also found that the intent of the parties was that appellee was to receive one-half of the value of appellant's share in the plan, less the premarital amount, fixed as of May 30, 2007, for a total of $319,097.81. The court granted judgment in favor of appellee against appellant in the amount of $115,936.81, the difference between what she had been paid and $319,097.81. The court found that appellee had disputed that her share was correctly valued at $319,097.81 in April 2008, refused a distribution at that time, and waited six months to litigate the issue. The court held that this did not result in appellee waiving her share of appellant's account, but it did preclude her from receiving interest on her share or her attorney's fees. Additionally, the court dismissed the retirement plan and appellant in his capacity as administrator from the case and denied appellee's motion for contempt against appellant. The court entered its written judgment on October 1, 2009, and on October 14, 2009, appellant filed his notice of appeal.[3]

---

3. On October 8, 2009, appellant filed a timely motion for reconsideration. Pursuant to Ark. R.App. P.-Civ. 4(b)(1), the circuit court had thirty days—until Monday, November 9—in which to decide the motion and enter its decision on record or the motion would be deemed denied. The court entered its letter opinion granting the motion for reconsideration on November 16, 2009, and a written order on November 30, 2009.

The circuit court's ruling on the motion for reconsideration has no effect because the court lost jurisdiction to act on the motion after the expiration of thirty days. See Cincinnati Ins. Co. v. Johnson, 367 Ark. 468, 241 S.W.3d 264 (2006). Because the motion was deemed denied by the court's inaction within thirty days, the original judgment and rulings stand without alteration. Slaton v. Slaton, 330 Ark. 287, 956 S.W.2d 150 (1997).

Appellant's sole argument on appeal is that the circuit court clearly erred in finding that appellee was entitled to a judgment against appellant in the amount of $115,936.81. We agree. Although equity cases are reviewed de novo, and the whole case is open for review, the findings of fact by the circuit judge in equity cases are not to be set aside unless clearly erroneous. *Stehle v. Zimmerebner*, 375 Ark. 446, 291 S.W.3d 573 (2009); *see also* Ark. R. Civ. P. 52(a) (2011). In determining whether the circuit judge clearly erred with regard to a factual finding, the appellate court may look to the whole record to reach that decision. *Stehle*, 375 Ark. at 455, 291 S.W.3d at 580. A finding of fact is clearly erroneous when the reviewing court, based on the entire evidence, is left with the definite and firm conviction that a mistake has been made. *Id.* Therefore, "a complete review of the evidence and record may take place as part of the appellate review to determine whether the trial court clearly erred in either making a finding of fact or in failing to do so." *Id.* at 456, 291 S.W.3d at 580.

It is well established that when parties enter voluntarily into an independent property-settlement agreement that is incorporated into a decree of divorce, it cannot subsequently be modified by the court. *Gentry v. Gentry*, 327 Ark. 266, 938 S.W.2d 231 (1997). Property-settlement agreements, especially after approval by a circuit court, are considered binding and final contracts between the parties. *See Brewer v. Brewer*, 239 Ark. 614, 390 S.W.2d 630 (1965). Moreover, pursuant to Ark.Code Ann. § 9–18–101 (Repl.2009), a QDRO is defined as a domestic relations order

(A) Which creates or recognizes the existence of an alternate payee's right to, or assigns to an alternate payee the right to, receive all or a portion of the benefits payable with respect to a participant's retirement plan;

(B) Which clearly specifies the name and last known mailing address, if any, of the participant and the name and mailing address of each alternate payee covered by the order, the amount or percentage of the participant's benefits to be paid by the plan to each alternate payee or the manner in which the amount or percentage is determined, the number of payments or period of time to which the order applies, and each retirement plan to which the order applies; and

(C) Which does not require the retirement plan to provide any type or form of benefit, or pay options not otherwise available under the plan, does not require the plan to provide increased benefits, and does not require the payment of benefits to an alternate payee that are required to be paid to another alternate payee under another order previously determined to be a qualified domestic relations order; and

Furthermore, Ark.Code Ann. § 9–18–102 (Repl.2009), provides that

(a) Notwithstanding §§ 24–3–212 and 24–7–715 [neither applicable to the present case] or any other laws of Arkansas limiting the application of legal process to any retirement plans, the circuit courts of Arkansas are empowered to enter qualified domestic relations orders to reach any and all retirement annuities and benefits of any retirement plan.

(b) The qualified domestic relations order of the circuit court is authorized to specify that a designated percent of a fractional interest on any retirement benefit payment may be paid to an alternate payee.

The QDRO in the present case, in accordance with the property-settlement agreement, directed that 38.551% of the account

balance of appellant's retirement plan as of May 30, 2007, which represented appellee's fifty-percent interest after deducting the premarital balance, be assigned to appellee in a separate account. The QDRO gave appellee the right to elect to receive her portion as a "single sum distribution" and expressly provided that once appellant's retirement plan had been separated, neither appellant nor appellee had any further right, title, or interest in the other's segregated account, including any increase in the value thereof; each account was the "sole and separate property" of the respective parties.

Mr. Haynes, the accountant for the retirement plan, testified that he separated appellee's portion immediately upon receipt of the QDRO and determined that the market value of her one-half of appellant's retirement plan accumulated during the marriage as of May 30, 2007, was $319,097.54. He stated that appellee disagreed with this figure in August and September of 2007. Ms. Strigel, the attorney for the retirement plan, testified that she reviewed the QDRO prior to its implementation and that once the accounts were segregated, appellant no longer had control over appellee's portion. She stated that if appellee had taken an immediate distribution, she would have received approximately $319,000; however, as it was nearly two years later when appellee filled out the paperwork for a transfer, and due to a drop in the stock market, appellee's portion was less than that amount because her shares were no longer as valuable. Appellee admitted that she knew the QDRO had been entered and that the value of her portion was approximately $319,000. She testified that she believed she was entitled to more than that amount and that she refused distribution of the lesser amount. Furthermore, the State Farm agent and appellant testified that appellee was offered distribution of her portion, valued at approximately $319,000, in April 2008 but that she refused to accept the distribution because she believed she was entitled to more.

The circuit court specifically found that appellee had refused to accept the correct amount of her portion of appellant's retirement plan—$319,097.81—in the Spring of 2008; that she waited six months before litigating the issue; and that she eventually took what she contended was a partial settlement of $203,161.00. The circuit court declined to find that appellant was in contempt of the divorce decree for failing to reimburse appellee and it dismissed the retirement plan and appellant in his capacity as administrator of the plan from the action.

Based on all the evidence in this case, we are left with a firm conviction that the circuit court clearly erred by entering a judgment against appellant for $115,936.81 to the benefit of appellee after her separate account lost value between the time the QDRO was entered and when she elected distribution. The property-settlement agreement specifically contemplated that a QDRO could be necessary, and neither party disputes that a QDRO was entered and implemented without objection to effectuate the terms of their agreement. The QDRO separated appellant's retirement plan into an account for appellant and an account for appellee and specifically provided that neither party had any right, control, or interest in the account of the other. The fact that appellee elected not to take her "single sum distribution" in 2007 or early 2008, which she admits she chose not to do because she disputed the amount, did not transform her segregated account from her sole and separate property into property for which appellant was responsible. The account belonged to her

and any detriment due to her tardiness in exercising her legal right to it cannot be borne by appellant where the circuit court made no finding that appellant intentionally interfered with appellee's property right.[4] This is consistent with other jurisdictions. *See, e.g., Hoffman v. Hoffman,* 841 So.2d 695 (Fla.Dist.Ct.App.2003) (holding that a former spouse may not have an interest in the other spouse's assets or earnings after the final judgment of dissolution); *Allen v. Allen,* 118 N.C.App. 455, 455 S.E.2d 440 (1995) (affirming trial court's award to ex-wife of gains and losses of 401(k) account from the date of separation until the date of entry of a QDRO). Therefore, we conclude that the circuit court clearly erred in awarding appellee $115,936.81 where the losses due to market fluctuation occurred after appellee's portion of appellant's retirement plan had been segregated pursuant to the QDRO.

Reversed and remanded; Court of Appeals opinion vacated.

BAKER, J., not participating.

---

4. Neither party contends that the retirement plan gained or lost value due to market fluctuation between the date of the property-settlement agreement and the date the account was separated pursuant to the QDRO, in which it might be necessary to interpret the terms of the property-settlement agreement to determine how those gains or losses would be allocated. *See, e.g., Shorter v. Shorter,* 851 N.E.2d 378, 384 (Ind.App.2006) (addressing the issue of which party bears the burden of a loss in market value of a retirement account where the loss occurs "between the execution of the [s]ettlement [a]greement and the implementation of its terms" via QDRO).