Cite as 2024 Ark. App. 288

# ARKANSAS COURT OF APPEALS
## DIVISION I
### No. CV-22-315

| | |
|---|---|
| KEVIN CHERI<br>　　　APPELLANT/CROSS-APPELLEE<br><br>V.<br><br>LAURA CHERI<br>　　　APPELLEE/CROSS-APPELLANT | Opinion Delivered　May 1, 2024<br><br>APPEAL FROM THE BOONE COUNTY CIRCUIT COURT<br>[NO. 05DR-20-376]<br><br>HONORABLE JOHNNIE A. COPELAND, JUDGE<br><br>AFFIRMED ON DIRECT APPEAL; AFFIRMED ON CROSS-APPEAL |

**RITA W. GRUBER, Judge**

Today, we hand down two separate opinions: this case, *Cheri v. Cheri*, 2024 Ark. App. 288 (*Cheri I*), and *Cheri v. Cheri*, 2024 Ark. App. 289 (*Cheri II*).[1] Each case stems from the Boone County Circuit Court's distribution of the parties' personal property within their divorce proceeding.

In this case, Kevin Cheri contends on direct appeal that the circuit court erred in the manner in which it distributed his federal annuity, thrift savings plan (TSP), and group life insurance policy as well as the parties' IRA accounts. He further contends that the circuit court improperly relied on extra-record materials. We affirm all five points on direct appeal.

---

[1]Case No. CV-23-622. There is a third appeal filed with this court involving these parties, case No. CV-23-772. However, that case has not yet been submitted.

Laura Cheri cross-appeals. She contends that the circuit court erred by failing to make the award of her marital portion of Kevin's annuity retroactive to the filing of the complaint. We affirm on cross-appeal.

I. *Factual and Procedural History*

The parties were married for approximately twenty-nine years. When they married in 1992, Kevin was employed by the National Park Service (NPS).[2] Of the 504 months that Kevin was employed by the NPS, 326 months were during the parties' marriage. Multiple federal benefits were made available to Kevin through his NPS employment, including the annuity, life insurance policy, and TSP. Throughout the parties' marriage, Kevin was transferred and promoted to various positions within the NPS, often precipitating a move to a different state. Kevin's final position with the NPS was as the superintendent of the Buffalo National River. He retired from that position in 2018, at which time his annuity vested. That annuity was the parties' sole source of income after his retirement.

At the time of the parties' marriage, Laura was employed by the United States Postal Service (USPS). The parties agreed after they married that Laura would leave her USPS position to support Kevin professionally and personally, which included staying at home and caring for their four children, all of whom are now adults. Because Laura left her position with the USPS, she did not retain her USPS pension.

---

[2]Due to the parties' having the same last name, the multiple cases, and the presence of a cross-appeal, we refer to the parties by their first names for clarity and ease of reading.

Laura filed for divorce on October 14, 2020, and a final hearing was held on March 29, 2021, and June 14, 2021. Both parties provided testimony, as did Laura's brother, Rodney Ernhart, who helped financially support Laura during the pendency of the divorce; and Joseph Koenig, a certified public accountant. Laura is eleven years younger than Kevin, and at the time of the divorce hearing, Laura was fifty-five years old. Although she has an associate degree in business management, she had been out of the workforce for thirty years.[3] She has been treated for degenerative discs in her back, and she testified that she has arthritis in her knuckles and problems with her knees. Prior to the divorce hearing, she applied for several jobs but did not receive any interviews.

Laura was granted the divorce, and the decree was entered on February 11, 2022.[4] The circuit court found that certain items of personal property, seventeen savings bonds, Kevin's Arvest Bank account, and the parties' joint bank accounts were all marital property and divided them equally between the parties. The parties also had a marital residence, bonds, and other personal property that the circuit court ordered to be evenly divided or sold with the proceeds evenly divided. The distribution of that property—personal and real—is not at issue on appeal.

---

[3]Laura testified that during the marriage, she very briefly worked at Chik-fil-A and Hobby Lobby.

[4]We are mindful that on March 2, the circuit court entered a decree of divorce nunc pro tunc to correct a clerical error. Because the nunc pro tunc decree neither substantively amended the February 11 decree nor was an exercise of the circuit court's judicial discretion, the February 11 decree constituted a final, appealable order. *See, e.g.*, *Francis v. Protective Life Ins. Co.*, 371 Ark. 285, 292–94, 265 S.W.3d 117, 122–23 (2007).

The circuit court distributed the at-issue personal property as follows. The court found that the entirety of the TSP, including any nonmarital contribution by Kevin, should be divided equally. The circuit court found that the life insurance policy was a marital asset and ordered that the beneficiary of the policy be Laura with a contingency beneficiary provision in favor of their adult children. The court found that all the IRAs were marital property and ordered them to be divided equally between the parties. The court further found that at the time of Kevin's retirement, the parties made a "survivor benefit election" with respect to his annuity, and the court saw no reason that this "irrevocable election" should not continue. The decree contains a footnote stating that the court reviewed the United States Office of Personnel Management's (OPM's) website to ascertain information on federal benefits, including the specific wording that must be used to divide such benefits. The same day the decree was entered and pursuant to the decree, the court entered an order specifying that Laura is entitled to 44.5 percent of Kevin's gross monthly annuity (the annuity order). Because the decree and the February 11 annuity order "concluded [the parties'] rights to the subject matter in controversy," they constituted final, appealable orders. Ark. R. App. P.–Civ. 2; *Davis v. Davis*, 2016 Ark. 64, at 5, 487 S.W.3d 803, 806.

The circuit court declined to award Laura alimony, finding—as set forth in the decree—that neither party would have any substantial financial position over the other after the property division. The court further found that there should be "no reason" Laura's "needs will not be met by her share of the property settlement in this matter" and that "the

4

continuation of the survivor benefit portion of [Kevin's] . . . pension will be sufficient to meet her needs until her death."

On February 22, 2022, Laura moved for reconsideration, requesting that her award of 44.5 percent of the annuity be retroactive to October 14, 2020–the date she filed the complaint. The circuit court did not specifically rule on that motion, which was deemed denied by operation of law on March 24, 2022. The denial of that motion also constituted a final, appealable order.

Kevin takes issue with the way the circuit court divided the annuity, the TSP, the life insurance policy, and the parties' IRA accounts. Kevin further takes issue with the circuit court's review of materials on the OPM website. Laura takes issue with the circuit court's refusal to make the award of Laura's marital portion of the annuity retroactive to the filing of the complaint. As previously set forth, the February 11 decree, annuity order, and denial of the motion for reconsideration each constituted a final, appealable order, all of which both parties timely and appropriately appealed. Accordingly, we have jurisdiction to address the substantive issues raised on direct appeal and cross-appeal.[5]

## II.  *Standard of Review*

We review divorce cases de novo on appeal. *Chekuri v. Nekkalapudi*, 2020 Ark. 74, at 10, 593 S.W.3d 467, 473. "De novo review" means the whole case is open for review. *Stehle*

---

[5]We explicitly set forth our jurisdiction to address the merits of this case due to the existence of *Cheri II*, which involves the same parties and same substantive issues on direct appeal.

*v. Zimmerebner*, 375 Ark. 446, 455, 291 S.W.3d 573, 580 (2009). It does not mean that the circuit court's findings of fact are dismissed out of hand or that the appellate court becomes the surrogate circuit court. *Id.* at 455–56, 291 S.W.3d at 580. What it does mean is that a complete review of the evidence and record may take place as part of the appellate review to determine whether the circuit court clearly erred in either making a finding of fact or in failing to do so. *Id.* at 456, 291 S.W.3d at 580.

The circuit court's findings pertaining to the division of property will not be reversed unless they are clearly erroneous. *Chekuri*, 2020 Ark. 74, at 9, 593 S.W.3d at 473. A finding is clearly erroneous when the reviewing court, on the entire evidence, is left with a definite and firm conviction that a mistake has been made. *Id.* Special deference is given to the circuit court's superior position in evaluating the witnesses and their testimony. *Dare v. Frost*, 2018 Ark. 83, at 3, 540 S.W.3d 281, 283.

### III. *Points on Direct Appeal*

### A. The Annuity

Kevin contends that the circuit court erred in the way it distributed the annuity. The annuity was purchased for Kevin's benefit during his lifetime through his NPS employment. The annuity vested at the time of his retirement, and the annuity amount was based on Kevin's highest average pay over three consecutive years, the number of years he was employed, and a "multiplier" based on his age at retirement. However, the amount of his contributions had no bearing on the amount of the annuity purchased. Rather, the retirement amount was not set until he retired, and the annuity was purchased on his behalf.

6

The parties were married for 326 months of Kevin's 504 months' total employment with the NPS. Thus, Kevin's premarital service was 178 months. Because Kevin receives the annuity through the Civil Service Retirement System, he is not eligible for Social Security. During the marriage, Kevin and Laura opted into a survivor benefit plan as part of the annuity, pursuant to which Laura will continue to draw 50 percent of the monthly annuity payment *if* Kevin predeceases her. The gross monthly distribution of the annuity is $9,751.00. Because of the survivor benefit election, the total monthly distribution is reduced by approximately $1,000.00 a month prior to the $9,751.00 gross distribution. After taxes and insurance, the net distribution is $7,567.86. There is no dispute that Kevin is entitled to some portion of the annuity as his premarital property.

Kevin argued to the circuit court that the number of months of his marital service should dictate the percentage of the annuity awarded to each party. He asserted that because he was employed 326 of 504 months while married, Laura's portion should be one-half that amount, which produces a final percentage figure of 32.3 percent (326 divided by 504 divided by 2) of the monthly payment being awarded to her. On appeal, he advances the same formulation and contends that it was "clear" that the circuit court was trying to divide the marital assets equally and made no findings that supported an unequal division of the assets.

Laura argued that because the basis of the amount of the annuity was Kevin's three highest paid years of service, which undisputedly occurred during the marriage, his proposal was inequitable and unfair. Thus, Laura proposed a percentage based on Kevin's

7

contributions over the marriage. At the time of the marriage, Kevin had contributed $24,297.00. His total contributions on retirement were $215,246.00. The proportional increase is 89 percent. Dividing that between the parties, Laura argued that 44.5 percent was the appropriate figure for her portion of the annuity payment.

In the decree, the circuit court recognized that a 50/50 approach would not give Kevin any credit for his premarital service, explaining that its challenge was to craft a formula that did not penalize or grant a windfall to either party. The court found that the amount of the annuity was not based on the employee's contributions, but rather the employee's three consecutive highest years of salary, which occurred during the parties' marriage. Although the circuit court was not fully satisfied with either party's approach, it ultimately found that Laura's method of calculation did consider the growth of Kevin's salary over the parties' marriage. The circuit court concluded that because Kevin's contribution amounts were based on a percentage of his salary, the percentage increase in contributions over the length of the marriage would balance the equities between the parties. Accordingly, the annuity order specified that Laura is entitled to 44.5 percent of Kevin's gross monthly annuity. As to the survivor benefit election, the annuity order awards it to Laura in the same amount to which she would have been entitled if the divorce had not occurred. The court found that there was no reason the "irrevocable election" should not continue.

"At the time a divorce decree is entered, all marital property shall be distributed one-half to each party unless the court finds such a division to be inequitable." Ark. Code Ann. § 9-12-315(a)(1)(A) (Repl. 2020). "'[M]arital property' means all property acquired by either

spouse subsequent to the marriage" with certain exceptions not applicable here. Ark. Code Ann. § 9-12-315(b). However, mathematical precision is not required in that distribution, and the circuit court is vested with a measure of flexibility in apportioning the total assets held in the marital estate upon divorce. *Copeland v. Copeland*, 84 Ark. App. 303, 308, 139 S.W.3d 145, 149 (2003). The critical inquiry is how the total assets are divided. *Id.* Under the statute, the circuit court is given broad powers to distribute all property in divorce cases, marital and nonmarital, to achieve the requisite equitable distribution. *Id.*

If the court finds that an equal division of marital property will be inequitable, then "the court shall make some other division that the court deems equitable taking into consideration" a number of factors set forth in Arkansas Code Annotated section 9-12-315(a)(1)(A)(i)–(ix). "When property is divided pursuant to the foregoing considerations the court must state its basis and reasons for not dividing the marital property equally between the parties, and the basis and reasons should be recited in the order entered in the matter." Ark. Code Ann. § 9-12-315(a)(1)(B). While the circuit court must consider the factors set forth in the statute and state its reasons for dividing the property unequally, it is not required to list each factor in its order or to weigh all the factors equally. *Pratt v. Pratt*, 2019 Ark. App. 264, at 8, 576 S.W.3d 511, 516.

On appeal, Kevin argues that the circuit court applied an invalid and incorrect formula in determining the nonmarital percentage of the "defined benefit annuity" and additionally failed to credit charges against the annuity payment that accrued to Laura's benefit. In doing so, he relies on *Gray v. Gray*, 352 Ark. 443, 447, 101 S.W.3d 816, 817

9

(2003); *Cherry v. Cherry*, 55 Ark. App. 178, 934 S.W.2d 936 (1996); *Askins v. Askins*, 288 Ark. 333, 704 S.W.2d 632 (1986); and *Hargis v. Hargis*, 2018 Ark. App. 469, 561 S.W.3d 336.

Those cases do not support Kevin's position. For example, in *Gray*, our supreme court addressed the circuit court's method of calculating the nonemployee spouse's share of the appellee's teacher retirement annuity. There, the circuit court awarded the appellant one-half of the appellee's total *contributions* to what was a defined benefit plan rather than one-half of the plan's total *value*—treating the annuity as a defined-contribution plan. The Arkansas Supreme Court found that the circuit court's award was not an abuse of discretion because the court made "a good-faith effort to balance the equities of the case," and its decision was neither "arbitrary" nor "groundless." 352 Ark. at 458, 101 S.W.3d at 824. In other words, the circuit court acted within its discretion in determining which calculation method to use to determine the nonemployee spouse's share of the annuity. *See also Dove v. Dove*, 2009 Ark. App. 682, at 6 (distinguishing *Askins*, *supra*).

The same occurred here. While Kevin is correct that an unequal division of the total annuity payment occurred, it was in *his* favor, taking into account his premarital years of service. The marital portion of the annuity was divided equally. Because the circuit court divided the marital portion equally, discussion of the factors listed in Arkansas Code Annotated section 9-12-315(a)(1)(A)(i)–(ix) was not required. *See Dac Tat Pham v. Anh Thuy Nguyen*, 2019 Ark. App. 500, at 5, 588 S.W.3d 427, 430. Moreover, it is clear that the circuit court put a great deal of thought into its distribution, explaining its reasoning for apportioning the annuity the way it did within the decree—taking into consideration that

some portion of it was Kevin's premarital property, the growth of Kevin's salary over the length of the parties' marriage, and the percentage increase in contributions made over the length of the parties' marriage—as well as attempting not to penalize or grant a windfall to either party. We also note that in the decree, the circuit court declined to award alimony to Laura on the basis of the property distribution. *See Dixon v. Dixon*, 2023 Ark. App. 519, at 11, 679 S.W.3d 429, 436 (property division and alimony are complementary devices the circuit court may utilize in combination to make the dissolution of marriage equitable).

Kevin further argues that his method is mandated by federal regulations and is "the default federal position." The regulation he cites in support of that position states that a "pro rata share" of an annuity is "one-half of the fraction whose numerator is the number of months of federal civilian . . . service that the employee performed during the marriage and whose denominator is the total number of months of federal civilian . . . service performed by the employee . . . ." 5 C.F.R. § 838.621(a) (2024). However, the regulation is a definition regulation that provides the definition *if* a court awards the nonemployee a "pro-rata share." Multiple other federal regulations make clear that different methods and approaches may be used, and no particular approach is federally mandated. *See, e.g.*, 5 C.F.R. § 838.622(b)(1); 5 C.F.R. § 838.122; 5 C.F.R. § 838, Subpt. F, App. A; 5 C.F.R. § 838.101(a)(1)–(2) ("In carrying out the court's instructions, OPM performs purely ministerial actions in accordance with these regulations. Disagreement between the parties concerning the validity or the provisions of any court order must be resolved by the court."). Even Kevin's own CPA,

Koenig, testified that there were ways that the annuity could be divided other than those proposed by him and advanced by Kevin.[6]

The circuit court clearly took the time to educate itself in this very regulated area, given Kevin's second point on appeal. The circuit court determined that it would be "inequitable" to award Laura only 32.3 percent of the pension because Kevin's income during the marriage, which formed the basis for the annuity amount, was so much higher than his income prior to the marriage. The circuit court went to great lengths to consider the equities and divide the annuity in a manner that would be fair to the parties. The court reasoned that Laura's calculation method properly considered "the growth of Mr. Cheri's salary over the time the parties [we]re married," which was quite substantial. Given the substantial difference between Kevin's premarital income and his income at retirement, the circuit court was well within its discretion to account for that difference by awarding Laura 44.5 percent of the total monthly annuity payment.

Finally, Kevin contends that the circuit court erred in its distribution of the marital portion of the annuity because the court failed to reduce the amount awarded to Laura in light of the survivor benefits election. Recall, both Kevin and Laura opted into a survivor benefit plan as part of the annuity, pursuant to which Laura will continue to draw 50 percent

---

[6]The record does not reflect that the circuit court qualified Koenig as an expert. Koenig testified that he is not a forensic accountant and had no special training for marital settlements. He looked at OPM's website and provided some calculations based on numbers that were provided to him by Kevin's counsel via email. Moreover, in valuating an asset, the circuit court was free to accept or reject all or any part of the testimony of expert witnesses. *See, e.g.*, *Cole v. Cole*, 89 Ark. App. 134, 141, 201 S.W.3d 21, 25 (2005).

of the annuity payment *if* Kevin predeceases her. Had that election not been made, and Kevin predeceased Laura, she would have been left with no portion of the annuity. Because of the survivor benefit election, the total monthly gross annuity (approximately $10,751.00) is reduced by approximately $1,000.00 a month, resulting in the $9751.00 gross annuity payment. The circuit court, seeing no reason the "irrevocable election" should not continue, awarded the survivor benefit to Laura in the same amount to which she would have been entitled if the divorce had not occurred. Kevin contends that we should direct the circuit court to do the following:

> [D]ivide the annuity as if it there were no pre-deduction (i.e. set the annuity amount at $10,751.00, assign percentage income to each party under the numerator / denominator pro-rata formula (32.4 percent – or $3483.32 to Laura Cheri), and then assess the $1000.00 amount against that total, resulting in a distribution amount of $2483.32 to Laura Cheri, plus the Survivor Benefit.

Doing so would reduce Laura's monthly annuity payment from $4,339.19 to the $2,483.32.

First, Kevin cites no authority for this argument, and we will not consider an argument on appeal that has no citation to authority or convincing legal argument, nor will we research or develop an argument for an appellant. *See Davis v. Davis*, 2013 Ark. App. 180, at 6. Second, Laura realizes the survivor benefit only if she outlives Kevin. This is too attenuated a benefit to warrant a real-time reduction. We further note the circuit court's refusal to award Laura alimony, based in part on "the continuation of the survivor benefit portion of [Kevin's] . . . pension" being "sufficient to meet her needs until her death." *See Dixon*, *supra*. The circuit court made a "good-faith effort to balance the equities of the case," ultimately making an *equitable* distribution. Because we are not left with a definite and firm

13

conviction that a mistake has been made, we affirm the circuit court's distribution of the annuity.

## B. Extra-Record Materials

Kevin next contends that the circuit court impermissibly relied on extra-record materials instead of controlling statutes and provisions of the *Code of Federal Regulations*. Laura responds that he is estopped from making this argument; he has neither alleged nor demonstrated that he was prejudiced by any alleged evidentiary error; and he has not demonstrated the circuit court abused its discretion in light of Arkansas Rule of Evidence 201 as well as our case law and that of other jurisdictions.

The decree contains this footnote:

> The Court's information on the Federal retirement benefits came from an exhaustive search of the Office of Personnel Management (OPM)'s website, which includes multiple 200+ manuals detailing the benefits themselves, and the effect upon divorce, including specific wording that must be used to divide the benefits. This information is available to the public and can be found at www.opm.gov/retirement-services.

The decree also contains a second footnote that references a link to a page on the OPM website addressing the impact that life events, such as divorce, may have on a federal retiree's annuity and benefits.

There is no specific indication in the record that the circuit court relied on any extra-judicial opinions or anything other than the very regulations that Kevin himself relies on. It appears to us that the circuit court was ensuring that any action it took did not run afoul of any federal regulations, as evidenced by the provisions of the decree addressing the need for subsequent orders to execute the court's directives. Further, Kevin's own counsel at the

14

hearing told the court that it could "look at the OPM website if it chooses to" to determine "what the [OPM] . . . says." Kevin may not now complain on appeal that the circuit court did the very thing that he recommended in the first instance. As such, his counsel's statement calls into question whether this argument was preserved. Nevertheless, we reject his argument under the invited-error doctrine. *See, e.g.*, *Rachel v. Rachel*, 21 Ark. App. 77, 79, 733 S.W.2d 735, 739 (1987) (under the invited-error doctrine, the appellant may not complain on appeal of an erroneous action of the circuit court if the appellant has induced, consented to, or acquiesced in that action).

## C. The TSP Account

Kevin next contends that the circuit court improperly distributed his TSP account. According to the decree, a TSP is a retirement savings and investment plan for federal employees similar to a traditional 401k plan offered by an employer. Kevin argues that the TSP account balance was $8,519.00 when the parties married, and the circuit court failed to properly credit him for that amount when dividing the TSP account. Kevin relies on *Thomas v. Thomas*, 68 Ark. App. 196, 4 S.W.3d 517 (1999).

Laura contended that she contributed her own premarital funds—$4261.62 total—from her USPS employment to the marital IRAs, of which Kevin was to receive 50 percent under the decree—and requested that the TSP account also be divided equally in return. Laura further testified that Kevin made "catch up" payments to the TSP rather than their shared IRAs. In other words, marital funds were deposited into an account that had a

15

nonmarital portion rather than depositing those marital funds into the marital IRAs. The record reflects "catch-up" funds of $45,300.00.

At the time of divorce, the TSP account held $383,504.12. Until October 22, 2019, Laura was the sole beneficiary of the TSP account. The record reflects that on that date, Kevin filled out a form changing the TSP beneficiary designation from Laura to their four adult children in equal shares. The record further reflects that the TSP election began January 3, 1988—approximately four years prior to the parties' marriage. Thus, the bulk of the funds contained within the TSP account were contributed during the parties' marriage. The circuit court ordered that the entirety of the TSP, including any nonmarital contribution by Kevin, be divided equally. In doing so, the circuit court set out in the decree that it had taken into consideration the following:

> the length of the parties' marriage, the contribution of . . . [Laura's] non-marital TSP to the marital IRA(s) the relative earning and financial positions of the parties during the marriage, and the fact that the parties contributed marital "catchup" funds to the TSP during the marriage.

*Thomas*, *supra*, does not support Kevin's position. In *Thomas*, the circuit court was attempting to return the appellant's nonmarital portion of his retirement account to him but failed to account for the growth of that nonmarital portion over time. 4 S.W.3d at 521, 68 Ark. App. at 202. Here, the circuit court was not attempting to return Kevin's nonmarital portion to him; rather, the "circuit court recognized the marital and nonmarital character" of the contributions, and pursuant to Arkansas Code Annotated section 9-12-315(a)(2), explained why it divided the account as it did. *See Joheim v. Joheim*, 2022 Ark. App. 210, at 7,

645 S.W.3d 363, 367–68 (no clear error where the circuit court equally divided nonmarital retirement accounts and explained its basis for doing so within its order); *see also Harp v. Harp*, No. CA99-1438, 2000 WL 1226361, at *3 (Ark. App. Aug. 30, 2000). And we note once more the circuit court's declination to award alimony to Laura on the basis of the parties' overall property distribution. We do not believe that the circuit court's apportionment of the TSP account was inequitable or in error. Thus, we affirm the circuit court's distribution of the TSP account.

## D. The Life Insurance Policy

For his fourth point on appeal, Kevin contends that the circuit court incorrectly distributed the life insurance policy to Laura. Laura was the sole beneficiary of the policy until October 22, 2019, when Kevin also designated their four children as equal beneficiaries. Laura testified that the "policy reduced by seventy-five percent as of the time [Kevin] turns sixty-five until it gets down to $38,000, and then it remains at that." Kevin testified as follows:

> That life insurance policy she's talking about is a very small amount. Ahh—at the time I had checked it last it had about a $39,000.00 value. Every month a [sic] subtract 3,100 and some dollars now from that amount. Her statement about it not going under $38,000 is new to me. I don't know that to be true. As far as I know it continues to decrease until it zeros out. So, it's really to me, it's insignificant to me.

The circuit court found that the parties acquired the policy during the marriage; that marital funds were used to pay the policy premiums; and that there were no more premiums due to maintain the policy. The circuit court thus concluded that the policy was a marital asset. The court explained in the decree that the policy was "difficult to monetize" because

17

it would continue to reduce in value over the length of Kevin's life. The circuit court ordered that Laura be the policy beneficiary, with a contingent beneficiary provision in favor of their adult children, should she predecease Kevin. In doing so, the circuit court set out that this seemed to be "the only equitable way to divide [the policy] considering both the parties' past intentions regarding" the policy.

On appeal, Kevin's argues that if he should remarry, he is "left with no option to provide for his spouse through federal insurance, or in the alternative to provide any benefit to his children" due to the award of the policy to Laura. Kevin again cites *Gray*, *supra*. *Gray* does not support Kevin's contentions regarding the policy. We will not consider an argument on appeal that has no citation to authority or convincing legal argument, nor will we research or develop an argument for an appellant. *See Davis*, 2013 Ark. App. 180, at 6. There is no question that the policy was marital property. It is not as though Kevin can be named the beneficiary, and it is a benefit that Laura realizes only if he predeceases her. The circuit court's order considers their adult children. Because we are not left with a definite and firm conviction that a mistake has been made, we affirm the circuit court's distribution of the policy.

### E. The IRA Accounts

Last, Kevin takes issue with the distribution of the parties' IRA accounts. The circuit court found that all the IRAs were marital property and divided them equally between the parties. Kevin disagrees with the determination that the IRAs were entirely marital property,

arguing that the circuit court erred in failing to engage in any evaluation of what portion of the IRA accounts was premarital.

At the time of trial, the Vanguard IRA in Laura's name was valued at $193,873.44, and the IRA in Kevin's name was valued at approximately $318,000.00. Laura testified that she contributed $4,261.00 of her premarital funds—received through her USPS employment—to start an IRA. Exhibits supporting her testimony were admitted into evidence at the final hearing. She further testified that Kevin had no premarital IRA, and his premarital funds were deposited into the TSP account. Kevin testified that he already had two IRAs when he and Laura were married, one with Prudential and one with Hibernia National Bank. He estimated that those two IRAs had a value of $23,000.00, which was rolled over into an IRA at Prudential and later transferred to Vanguard. However, he testified that it was Laura who managed the IRAs and that he had no "extrinsic proof" of the existence of his premarital IRAs.

Following the hearing, the circuit court ordered Kevin to provide additional evidence concerning his alleged IRAs, but he failed to do so. Special deference is given to the circuit court's superior position in evaluating the witnesses and their testimony. *Dare*, 2018 Ark. 83, at 3, 540 S.W.3d at 283. Accordingly, the circuit court was well within its discretion to determine, based on the evidence it had, that the parties' IRAs were composed entirely of marital property subject to equal distribution. Thus, we affirm the distribution of the parties' IRA accounts.

IV. *Cross-Appeal: Retroactivity*

19

On cross-appeal, Laura contends that the circuit court erred by failing to make the award of her marital portion of the annuity retroactive to the filing of the complaint, particularly considering Kevin's alleged noncompliance with court orders. The decree's annuity award dates from the entry of the decree. Laura filed a motion for reconsideration on this issue, which was deemed denied.

After Kevin retired and prior to Laura filing for divorce, both parties relied completely on the monthly annuity for income. It is Laura's position on appeal that the evidence reflected that she received no income for the sixteen months that transpired from the date she filed for divorce until entry of the decree, while Kevin received the entirety of the monthly annuity payment. Kevin responds that evidence of her financial status during the divorce was provided entirely by her testimony and that of her brother, all of which the circuit court was free to believe or not.

The record reflects that Kevin had the use and enjoyment of the marital home during almost the entirety of the proceedings, during which time he paid the mortgage from the annuity payment. The marital home was ordered sold with the proceeds divided evenly. Laura relied on her brother to permit her to stay in one of his resort rental cabins in another state, essentially rent-free. But there is no evidence in the record that Laura could not have remained in the marital home as well. Laura further testified that she was unable to find employment during that time and had to rely on a credit card to make her ends meet during the divorce. However, Kevin paid the credit card bill—some $14,000.00—although, admittedly, some of those charges belonged to him. Laura had the use of her newer vehicle,

20

for which she paid nothing during the divorce, while Kevin drove one of their children's cars. The record does not reflect that Laura paid any bills during the pendency of the divorce. Thus, while Laura was not directly provided any portion of the annuity payment, she did receive some benefit from it during the pendency of the divorce. Given the way the circuit court divided the parties' property overall, we hold that the circuit court's decision to deny a retroactive application of the annuity award was not in error. As to Kevin's alleged noncompliance with any court orders, that may be grounds for a contempt petition but not a retroactive award of marital property. Accordingly, we affirm.

## V. *Conclusion*

The decree, the annuity order, and the denial of the reconsideration motion were all final, appealable orders. Neither Kevin nor Laura demonstrated that the circuit court committed reversible error. Accordingly, we affirm those orders in their entirety.

Affirmed on direct appeal; affirmed on cross-appeal.

GLADWIN and KLAPPENBACH, JJ., agree.

*Jeremy B. Lowrey*, for appellant/cross-appellee.

*Taylor & Taylor Law Firm, P.A.*, by: *Tory H. Lewis*, *Andrew M. Taylor*, and *Tasha C. Taylor*, for appellee/cross-appellant.

21